AO 91 (Rev. 11/11)  Criminal Complaint   (modified by USAO for telephone or other reliable electronic means)

# UNITED STATES DISTRICT COURT
### for the
### Southern District of Ohio

| | | |
|---|---|---|
| United States of America | ) | |
| v. | ) | |
| | ) | Case No. |
| FREDERICK LOUIS TANZER | ) | 3:24-mj-735 |
| | ) | |
| | ) | |
| | ) | |
| *Defendant(s)* | | |

FILED
RICHARD W. NAGEL
CLERK OF COURT
12/11/24
U.S. DISTRICT COURT
SOUTHERN DIST. OHIO
WEST. DIV. DAYTON

## CRIMINAL COMPLAINT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.
On or about the date(s) of __December 11, 2024__ in the county of __Hamilton__ in the __Southern__ District of __Ohio__, the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. § 1001(a)(2) | False Statements or Representations to an Officer or Agency of the United States. |

This criminal complaint is based on these facts:

See affidavit of SA Eric McIntosh, FBI

☑ Continued on the attached sheet.

*/s Eric McIntosh*
*Complainant's signature*

SA Eric McIntosh, FBI
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by __Telephone__ *(specify reliable electronic means)*.

Date: December 11, 2024

City and state: Dayton, Ohio

Caroline H. Gentry
United States Magistrate Judge

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | | |
|---|---|---|
| IN THE MATTER OF THE CRIMINAL COMPLAINT OF: | ) ) ) | |
| | ) | Case No.   3:24-mj-735 |
| FREDERICK LOUIS TANZER | ) ) ) | |

**AFFIDAVIT IN SUPPORT OF**
**CRIMINAL COMPLAINT AND ARREST WARRANT**

I, Eric McIntosh, being first duly sworn, hereby depose and state as follows:

**INTRODUCTION AND AGENT BACKGROUND**

1. I submit this affidavit in support of a criminal complaint and arrest warrant for FREDERICK LOUIS TANZER for a violation of 18 U.S.C. § 1001(a)(2) (False Statement or Representation to an Agency of the United States).

2. I am a Special Agent with the Federal Bureau of Investigation ("FBI") and have been since August of 2003. My primary duties as a Special Agent consist of investigating criminal enterprises, narcotics trafficking, organized crime, and violent crimes. As part of my standard training to become an FBI Special Agent, I have received specialized training in the means and methods by which individuals and criminal enterprises conduct their illegal activities, as well as in the use of various investigative techniques used to uncover unlawful activities. I have received further specialized training concerning analyzing, processing, and preserving violent crime scenes.

3. I have participated in various types of electronic surveillance, including the interception of wire communications, in investigations of drug traffickers, money launderers, and violent criminal enterprises. I am also familiar with, and have personally participated in,

other normal methods of investigating individuals and criminal enterprises, including, but not limited to, visual surveillance, the questioning of suspects and witnesses, the use of informants, and undercover operations.

4.	In connection with this investigation, I have spoken with, and learned from the experience of, other agents and officers experienced in the investigation and prosecution of sex crimes, including rape. I have also reviewed relevant crime analysis products concerning sexual assaults and rapists, including studies about certain tactics more likely to be employed by a serial rapist than a one-time rapist. I have also consulted with law enforcement experts regarding analyzing an offender's motivation, victim selection, sophistication level, actions, and relationship to a particular crime.

5.	The facts in this Affidavit are based on my personal knowledge as well as on information I learned from other sources, including but not limited to reports prepared by other law enforcement officers and conversations I have had with other law enforcement officers and witnesses involved in this investigation.

6.	Because I am submitting this affidavit for the limited purpose of securing a criminal complaint and arrest warrant, I have not included every fact that I know about this investigation; I have set forth only those facts that I believe are necessary to establish probable cause to believe that TANZER has violated 18 U.S.C. § 1001(a)(2).

## STATEMENT OF PROBABLE CAUSE

A. Introduction

7.	In or about March 2024, Cincinnati Police Department ("CPD") Detective Jeffrey Smallwood contacted me to discuss an unsolved 1989 rape investigation in which FREDERICK LOUIS TANZER—who at the time of the rape was married to the Victim's

2

best friend, and who was and is a medical doctor practicing in the Southern District of Ohio—had been recently identified as the prime suspect. I agreed with Det. Smallwood that, due to the sophisticated and brutal nature of the hours-long attack as described by the Victim, and based on my training and experience, my discussions with law enforcement officers experienced in rape investigations, allegations of other sexual assaults TANZER may have committed, and my review of relevant crime-analysis literature on the topic, it was likely that the perpetrator of the 1989 rape was a serial offender and that additional investigation was warranted. I know that serial rapists often use vehicles and/or cell phones—instrumentalities of interstate commerce—to facilitate their sexual attacks, and that these offenders can be prosecuted for, among other things, kidnapping in violation of 18 U.S.C. § 1201(a)(1). I recognized that the FBI was well positioned to provide resources to assist with the investigation, confirm TANZER was the offender, and obtain evidence for a federal prosecution of TANZER.

8. In April 2024, as part of my investigation, an FBI surveillance team saw TANZER leave his residence and then discard a Starbucks coffee cup. As described in more detail below, DNA extracted from TANZER's coffee cup was confirmed by a forensic laboratory as a match to the DNA the rapist had left at the 1989 crime scene.

9. Earlier today, on December 11, 2024, investigators approached TANZER at his home, and TANZER made several materially false statements during an interview, including false statements related to the 1989 rape.

10. For the reasons I give below, I submit that there is probable cause to believe that TANZER has violated 18 U.S.C. § 1001(a)(2) (False Statements or Representations to an Officer or Agency of the United States).

3

**B. On August 1, 1989, the Victim was violently raped in her own home, and semen from the attacker—later matched to TANZER—was collected in a rape kit.**

11.     On Tuesday, August 1, 1989, at approximately 5:00 p.m., the Victim returned to her condominium at 3710 Creighton Place in Cincinnati after working at the IBM offices in downtown Cincinnati. The Victim later told law enforcement that, upon entering her home, she noticed a strange odor that smelled to her like brewed tea or burnt marijuana. She went into her bathroom and noticed that, although she lived alone, the toilet seat was up, and someone had urinated in the bowl.

12.     According to the Victim, as she exited the bathroom and walked into the dining room, a person dressed from head to toe in black Lycra surprised her from the kitchen. The assailant—identified decades later, through DNA analysis, as FREDERICK LOUIS TANZER—was wearing black gloves and a black mask that completely covered his face. The Victim screamed, at which point the assailant (TANZER) made a "shhh" sound, grabbed the Victim around the neck, put a knife to her throat, and took her into the kitchen, where he had a black gym bag.

13.     According to the Victim, the assailant (TANZER) then forced her back through the dining room, into the living room, and towards the bedroom. As they walked, the Victim told TANZER he could have anything he wanted in the condo. TANZER did not respond; instead, he forced the Victim into the bedroom.

14.     According to the Victim, the assailant (TANZER) took tape—later determined to be white surgical tape—from the black gym bag and wrapped it around the Victim's eyes and head until there was about a quarter-inch thickness from the Victim's forehead to the top of her nose. He then shoved the Victim back onto the bed and forcefully grabbed her arms. He used stockings and pantyhose from the Victim's dresser to bind her hands to the brass

headboard and her feet to the footboard.

15. According to the Victim, the assailant (TANZER) cut or tore the Victim's clothing to allow access to her body. He then smeared what she believed to be Vaseline all over her genital area. TANZER then proceeded to rape the Victim vaginally. When the Victim yelled in pain and fear, TANZER put the knife on her neck again. He then took a cloth and put it in the Victim's mouth, and then took it out, and then put it back in again. The Victim told TANZER that she would not scream.

16. According to the Victim, after the assailant (TANZER) penetrated her vaginally, he then put his penis her in mouth, where he proceeded to ejaculate. When he was finished, he took a cloth and thoroughly wiped both the inside and outside of her mouth and also cleaned around the vaginal area; the Victim interpreted this as an attempt to wipe away semen.

17. Per the Victim, the assailant (TANZER) then got up and seemingly disappeared for a while. She then heard the squeak of her rocking chair across the bedroom. The Victim could see slightly under the tape that TANZER had wrapped around her eyes and believed that the man took off his mask briefly. Although the Victim only got a glimpse of her assailant and could not see his face clearly, she said he appeared to be white and had dark brown hair. It was hard for her to make out the rest of his features, although he appeared to be approximately six feet tall with a thin or athletic build.

18. According to the Victim, the assailant (TANZER) then yanked the ties from the Victim's wrists and flipped her over onto her stomach. TANZER then penetrated the Victim with his penis rectally. At this point, the Victim was in such fear and pain that she began crying.

19. Per the Victim, the sexual assaults continued for a period of approximately five and a half hours. TANZER used a lubricant he brought with him. In between bouts of sexual conduct, TANZER wiped the Victim's body, including her vagina and mouth, which the Victim interpreted as an attempt to wipe away semen.

20. According to the Victim, the assailant (TANZER) said nothing during the entire encounter. He occasionally took breaks from sexually assaulting the Victim. At one point, the Victim heard TANZER manipulate the answering machine located in the Victim's bedroom, including by listening to messages and erasing them. The Victim also heard him handling papers in the living room.

21. The Victim told law enforcement that eventually the assailant (TANZER) loosened the binding on one of the Victim's hands and exited the apartment. The Victim was able to free herself and made her way to the downstairs neighbors, who called 911 to notify police and assisted the Victim in cutting the tape from her head.

22. Responding officers spoke with the Victim and secured the crime scene. A criminalist photographed the scene and collected evidence, including the tape that had been wrapped around the Victim's head. Stockings and pantyhose were still tied to the bed; these were photographed and collected.



*Figs. 1 and 2: Crime Scene Photos of Pantyhose Used to Bind the Victim*

23. The knife believed to be used by the suspect had been returned to the kitchen; it was collected as evidence as well.



*Fig. 3: Crime Scene Photo Showing Knife Believed to be Used in Attack*

24. Officers discovered that the phone in the kitchen had been unplugged. The phone in the bedroom had also been disconnected at the handset.

7





*Figs. 4 through 6: Crime Scene Photos Showing Phones Disconnected*

25. Taped to the handset of the phone in the bedroom was a piece of newspaper that had been cut from a paper on the couch in the living room. Written on the paper was, "No police or I'll be back mis IBM." (Recall that the Victim worked at IBM at the time.) The printing appeared intentionally crude as if the writer were attempting to disguise his handwriting.

8



*Fig. 7: January 2024 Photo of Threatening Note on Newspaper Collected from Crime Scene on August 1, 1989*

26. The Victim's purse had been moved and rummaged through, but nothing appeared to be missing.

27. The Victim was transported to University Hospital for a sexual assault nurse exam. Her clothing was collected. This evidence was submitted to the Hamilton County Coroner's Office for analysis. Semen was identified on rectal swabs and on the Victim's clothing. All the evidence gathered from the 1989 crime scene was securely stored and preserved, including the semen samples. There were two latent fingerprints identified from the scene that did not belong to the Victim.

28. Throughout the years, the Victim remained in contact with the CPD regarding the status of the investigation. As described in the CPD case file, the Victim made "every effort to participate in the investigation," going so far as to hire private investigators, participate in media interviews, and submit to hypnosis. Despite the Victim and law enforcement's efforts, the case went cold.

//

//

9

**C. In 2024, DNA analysis showed that the semen recovered from the Victim belonged to TANZER, who in 1989 was married to the Victim's best friend.**

29. In April 2024, law enforcement began surveilling TANZER for the purpose of obtaining a DNA sample for comparison with the semen recovered from the person and clothing of the Victim.

30. On the morning of April 9, 2024, law enforcement surveilled TANZER as he left his townhome—located at 5526 East Galbraith Rd., Cincinnati, OH 45236—and traveled to the Bureau of Motor Vehicles located at 1007 Lila Avenue in Milford, Ohio. TANZER was holding a Starbucks cup when he arrived at the BMV.



*Figs. 8 and 9: Surveillance Photos of TANZER on April 9, 2024*

31. Surveillance specialists watched TANZER throw a Starbucks cup into the trash at the BMV. Shortly after TANZER left the BMV, at about 8:40 a.m., FBI Surveillance Specialist Chris Schiazza recovered the coffee cup from the trash, noting that the trash bag was mostly empty and that TANZER's coffee cup was the only cup in the trash bag. As shown in the image below, the cup had the name "FRED" on it:

10



*Fig. 10: Photo of Coffee Cup Retrieved from the BMV Trash on April 9, 2024*

32. The cup was transferred to CPD's Crime Laboratory later that morning for processing by a CPD Criminalist. An analysis by the Hamilton County Coroner's Office of DNA recovered from TANZER's cup revealed that it matched the DNA profile of the semen recovered from the dress the Victim was wearing on the night of the 1989 rape.

33. According to the Victim (and corroborated by divorce documents I have reviewed), TANZER is the ex-husband of the Victim's close friend, "Individual 1." The Victim said she had never had any type of sexual relationship with TANZER. The Victim could offer no alternative explanation as to why TANZER's semen would be on her clothing. Both TANZER and his then wife, Individual 1, were captured on messages on the answering machine in the Victim's home (i.e., the machine the suspect manipulated on the night of the rape).

34. According to my review of Ohio BMV records and physical observations, I know that TANZER is a white male with dark hair who is approximately 5'10". The Victim told investigators that, although at the time of the rape she did not consider TANZER a possible suspect, in part because of her close relationship with him and Individual 1, in retrospect TANZER's build at the time was consistent with that of her assailant.

11

35. TANZER is a practicing doctor and has been since the 1980s, including at the time of the rape. According to records from a local hospital, and based on an active page on the hospital's website as of December 2024, TANZER is affiliated with several Cincinnati-area hospitals, where he practices hospital medicine.

**D. On December 11, 2024, TANZER willfully made materially false statements to the FBI in violation of 18 U.S.C. § 1001(a)(2).**

36. On December 11, 2024, CPD Detective Jeffrey Smallwood and I interviewed TANZER at his home.

37. Before asking TANZER any substantive questions, I identified myself as a Special Agent with the FBI and informed TANZER that it was a crime to lie to an FBI agent.

38. At the beginning of the interview, Det. Smallwood and I told TANZER, as a ruse, that the FBI and CPD were investigating how CPD originally handled the investigation into the 1989 rape involving TANZER's friend, the Victim.[1] We told TANZER (falsely) that a complaint had been lodged alleging that CPD had never seriously investigated the 1989 rape because the prime suspect had been a CPD officer. I told TANZER that the FBI had been called in to investigate alleged police corruption due to the mishandling of the investigation. We explained to TANZER that TANZER should have been interviewed at the time of the attack to see if he had information about the CPD officer, and that the purpose of our present investigation was to identify how CPD had mishandled the investigation, including by failing to interview potential witnesses.

39. During our interview with TANZER, TANZER made multiple materially false statements; however, for the purposes of this criminal complaint, I am describing just one of

---

[1] We identified the Victim to TANZER using the Victim's legal name at the time of the 1989 rape. I am not including the Victim's name here to protect her privacy.

12

those false statements here. During the course of our conversation, TANZER acknowledged having heard about the sexual assault of the Victim around the time the Victim was attacked, but he claimed not to recall specifically when the attack happened. Agents informed TANZER that the attack occurred on August 1, 1989. Later, TANZER verbally denied having seen and/or interacted with the Victim on the date she was assaulted. Towards the end of the interview, I handed TANZER a form memorializing his answers to several of our questions, including the question regarding whether he had seen and/or interacted with the Victim on the date of the assault:

[Form excerpt: Yes / ☒No / N/A — If Respondent is not the victim, did Respondent see, speak, or otherwise interact with (victim(s)) on 8/1/1989 (date(s) of interest)? If yes, specify type of contact and substance of communication, if any:
○ In person (specify location(s)): ___
○ By telephone/other audio/video means (specify means): ___
○ By written communication (specify means): ___
○ Other (specify): ___
If yes, detail below and include substance of communication, if any (attach extra sheets if necessary):]

*Fig. 11: Excerpt from Form Signed by TANZER on Dec. 11, 2024*

40. As shown below, the form also contained a warning that willingly making a false statement to a Department or Agency of the United States was a felony under 18 U.S.C. § 1001(a)(2). TANZER signed and dated the form, certifying that, to the best of his knowledge and belief, all statements on the form were true and accurate in all material respects:

*Fig. 12: Affirmation on Form Signed by TANZER on Dec. 11, 2024*

41. After TANZER signed the form described above, Det. Smallwood and I informed TANZER that we had reason to believe TANZER was not being truthful with us. TANZER then stated that he wanted a lawyer, at which point the interview ended. We informed TANZER that he was under arrest, and that we were obtaining a search warrant for TANZER's house and TANZER's DNA. I explained to TANZER and Individual 2—who was also in the house when we arrived to interview TANZER—what was going to happen next (i.e., transporting TANZER to my office and processing him). Individual 2 interrupted me and asked TANZER, "What is happening?" to which TANZER replied, "I don't know, honey. I need a lawyer."

42. We asked TANZER to stand up and put his hands behind his back. TANZER asked if he could get some shoes, and we assured him that we would take care of that for him. Individual 2 then asked us, "Where are you taking him?" and I explained that we would tell Individual 2 everything shortly. Just after we handcuffed TANZER and told him that if the handcuffs were too tight or uncomfortable we'd find another pair for him, TANZER told Individual 2, "We've got to find a great lawyer. I don't know what's going on."

//

14

## CONCLUSION

43. Based on the foregoing, I respectfully request that the Court issue the proposed criminal complaint and arrest warrant.

Dated: December 11, 2024

*/s Eric McIntosh*
ERIC McINTOSH
Special Agent
Federal Bureau of Investigation

Sworn to via reliable electronic means in accordance with Fed. R. Crim. P. 4.1 on December 11, 2024.

Caroline H. Gentry
United States Magistrate Judge